## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TALISA BORDERS, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OTISHA WOOLBRIGHT | ) | |
| | ) | |
| On behalf of themselves and all others | ) | |
| similarly situated, | ) | Civil No. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| 702 SW 8th Street | ) | |
| Bentonville, Arkansas 72716 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| Serve: | ) | |
| C T CORPORATION SYSTEM | ) | |
| 208 S LaSalle Street, Suite 814 | ) | |
| Chicago, Illinois  60604 | ) | |

### COMPLAINT

Plaintiffs Talisa Borders ("Ms. Borders") and Otisha Woolbright ("Ms. Woolbright"), on behalf of themselves and all others similarly situated, allege and state the following for their Class Complaint against Wal-Mart Stores, Inc. ("Walmart"):

### INTRODUCTION

1.      This case arises out of Walmart's discriminatory policies and practices concerning accommodations in the workplace for pregnant employees.  Walmart's policies and practices constitute discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§2000e, *et seq.*, as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k).  Having satisfied all administrative prerequisites, Ms. Borders and Ms. Woolbright file

1

this Complaint on behalf of themselves individually and on behalf of all women similarly situated.

2.      Proposed class members are current and former female employees of Walmart at stores nationwide subject to the company's pregnancy policies and practices between March 19, 2013 and around March 2014 when Walmart changed its policies.

## JURISDICTION

3.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4), which confers original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief or other relief under any Act of Congress providing for protection of civil rights; pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under the Constitution or laws of the United States; and pursuant to 28 U.S.C. § 1337, which confers original jurisdiction upon this court in a civil action arising under any Act of Congress regulating commerce.

## PARTIES

4.      Plaintiff Talisa Borders is female and a resident and citizen of East St. Louis, Illinois.  From July 25, 2012 to April 14, 2017, she was employed by Walmart as an associate at Store 1418 in O'Fallon, Illinois.

5.      Plaintiff Otisha Woolbright is female and a resident and citizen of Jacksonville, Florida.  From August 3, 2013 to January 15, 2014, she was employed by Walmart as an associate at Store 5817 in Jacksonville, Florida.

6.      Defendant Walmart Stores, Inc. is a Delaware corporation with its headquarters in Bentonville, Arkansas.  Walmart is a mass merchandiser of consumer products operating retail stores throughout the world.  Walmart employs more than 1.5 million associates in the United

States at more than 5,000 stores and clubs nationwide.  Walmart operates roughly 290 stores in

the state of Illinois alone, including the Walmart Supercenter located at 1530 W U.S. 50,

O'Fallon, Illinois, 62269. Walmart employs more than fifteen employees at each store location

around the country.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      On January 13, 2014, Ms. Borders filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") and the Illinois Human Rights Commission

alleging that Walmart had engaged in systemic sex and pregnancy discrimination through its

policies and practices devised and adopted at, and maintained from, corporate headquarters

concerning workplace accommodations for pregnant employees, in violation of both federal and

state civil rights laws.  Ms. Borders also alleged facts regarding retaliation in connection with her

pregnancy and requests for accommodations.  Ms. Borders' charge tolled the charge-filing

deadline, beginning March 19, 2013, for a class of all similarly situated females employed by

Walmart.  Ms. Borders requested her Right to Sue letter from the EEOC within 90 days of the

filing of this Complaint.

8.      On April 24, 2014, Ms. Woolbright filed a charge of discrimination with the

EEOC and the Florida Commission on Human Relations alleging that Walmart had

discriminated against her because of her sex (pregnancy). Ms. Woolbright also alleged facts

regarding retaliation. Ms. Woolbright received her Right to Sue letter from the EEOC within 90

days of the filing of this Complaint.

## ALLEGATIONS OF REPRESENTATIVE PLAINTIFF TALISA BORDERS

9.      As described above and below, Walmart discriminated against Ms. Borders

because of her sex and on the basis of pregnancy.

3

10.     While she was working at Walmart, Ms. Borders became pregnant.  Early in her pregnancy, Ms. Borders nearly slipped off a ladder she was climbing on during a shift.  Because she feared for the safety of her fetus and health of her pregnancy, she stopped climbing ladders and lifting heavy objects.  When she needed to perform these tasks, her co-workers assisted her.  Ms. Borders was able to do her job with this accommodation and planned to continue working throughout her pregnancy.  After several months of this arrangement, Crystal noticed that Ms. Borders was not using a ladder.  She told Ms. Borders that she needed to provide a note from her doctor to continue working at Walmart.

11.     On or around March 19, 2013, Ms. Borders provided Crystal with a note from her doctor stating that due to Ms. Borders' pregnancy, she could not lift more than 25 pounds or climb ladders.  Ms. Borders informed Walmart that she wanted to continue to work.  She asked to continue the task sharing arrangement with other employees that had been working to that point.  Crystal sent her to talk to Michelle in the Personnel Department and Tiffany, the Walmart Human Resources (HR) Training Coordinator, who refused her request.

12.     That same day, Tiffany told Ms. Borders that she was required to take an unpaid leave of absence.  Ms. Borders asked if she could be given an accommodation that would allow her to continue to work, but Tiffany refused and told Ms. Borders that Walmart only accommodated employees with medical conditions that arose from working at Walmart (*i.e.* on-the-job injuries).  Moreover, Tiffany told Ms. Borders that this policy came from Walmart District Human Resources and it was not up to the store manager to decide whether to accommodate an employee.

13.     At no time after HR became involved did Walmart engage in a discussion with Ms. Borders about what accommodations might reasonably address her restrictions and allow her

to continue to work, even though she had been able to perform her job by swapping some tasks with co-workers, and even though she was willing to be temporarily assigned to a different position which would not require heavy lifting or climbing.

14.    Walmart forced Ms. Borders to take an unpaid leave of absence beginning approximately March 19, 2013, even though her baby was not due for more than two months. Ms. Borders gave birth on June 1, 2013, and returned to work at Walmart on July 12, 2013, six weeks after the delivery of her child.

15.    When Ms. Borders returned to work, Walmart refused to reinstate her to her previous associate position at pay grade 3 in the Pharmacy Department where she had been working approximately 40 hours a week at $10.85 per hour when Walmart forced her to take leave.  Instead, Walmart assigned her to a pay grade 2 associate position at $8.85 per hour and moved her to various departments, including toys.  Ms. Borders eventually accepted a cashier position paying $9.05 per hour.  While Walmart later raised Ms. Borders' pay to $9.45 per hour, she would have received a higher wage if she had been reinstated to her former Pharmacy Department position.

16.    Ms. Borders is no longer an employee of Walmart.

### ALLEGATIONS OF REPRESENTATIVE PLAINTIFF OTISHA WOOLBRIGHT

17.    As described above and below, Walmart discriminated against Ms. Woolbright because of her sex and pregnancy.

18.    Soon after she was hired, in or around early September 2013, Ms. Woolbright found out that she was pregnant. She promptly informed her supervisor, Assistant Store Manager Teresa Blalock, about her pregnancy.

19.     In September 2013, Ms. Woolbright began experiencing pain and bleeding, and she feared she might be having a miscarriage or a serious complication with her pregnancy. She went to the Emergency Room and was told that she was at a high risk of miscarriage. When she was released from the hospital, she was given instructions, reflected on her discharge papers, that she should avoid heavy lifting.

20.     When Ms. Woolbright went to work in the Deli/Bakery department after being released from the hospital in or around mid-September, she notified Ms. Blalock that she had been in the hospital because of serious health concerns about her pregnancy. Ms. Woolbright also informed Ms. Blalock that she was directed by her doctor to avoid heavy lifting and she tried to give Ms. Blalock the paperwork from the hospital, but Ms. Blalock refused to accept it.

21.     In response to Ms. Woolbright telling Ms. Blalock that she was given instructions by her doctor to avoid heavy lifting, Ms. Blalock told Ms. Woolbright, "If you can't do [heavy lifting], you can walk out those doors." She also made a statement expressing concern that Ms. Woolbright was "a liability" and trying to "cost Walmart money." Ms. Blalock further told Ms. Woolbright that she had seen Demi Moore do a summersault on television toward the end of her pregnancy, so pregnancy was "no excuse" for Ms. Woolbright.

22.     Ms. Woolbright subsequently asked another manager, Holly, about whether there was a way for her to be transferred to a cashier position because she could not do heavy lifting during her pregnancy, but Holly told her she was ineligible for a transfer because she had not yet worked for Walmart for long enough.

23.     The heavy lifting made Ms. Woolbright very anxious about maintaining a healthy pregnancy.  She let Ms. Blalock know that the heavy lifting was directly contrary to her physician's orders.  However, because two managers refused to accommodate Ms. Woolbright

and because Ms. Blalock had threatened to terminate Ms. Woolbright if she continued to request accommodations, Ms. Woolbright had no choice but to perform heavy lifting at work, despite the health risk.

24.    On September 24, 2013, Ms. Woolbright was working in the store's deli. She was kneeling down and lifting heavy trays of rotisserie chickens to put them in the oven.  The trays weighed between thirty-five and fifty pounds.  Suddenly, she felt a shooting pain in her pelvic area, leg, buttocks, and back.

25.    She contacted Ms. Blalock, who told her she could go home. She went to the hospital later that day after intense pain continued.  Ms. Woolbright feared for the safety of her fetus and health of her pregnancy.  She had to miss several days of work after the injury.

26.    Once she had been injured on the job, and only after she returned to work, Ms. Woolbright was offered accommodations, which she had been denied before her injury. Walmart restricted Ms. Woolbright to sedentary work with no lifting.

27.    On January 12, 2014, Ms. Woolbright requested information concerning Walmart's policies on taking leave for childbirth in order to plan for her child's expected birth in March.

28.    On January 15, 2014, the next day that Ms. Woolbright was at work, Anthony Dennis, the Store Manager, interrogated Ms. Woolbright about her pregnancy and her efforts to find out about Walmart's policies related to time off to recover from childbirth. He told her that "Walmart will no longer be needing your services" and she was fired.

29.    Accordingly, Ms. Woolbright was terminated because of her pregnancy and pregnancy-related accommodation needs.

**FACTS UNDERLYING CLASS CLAIMS**

30.     Between some time prior to March 19, 2013 and March 2014, Walmart maintained and implemented a set of policies and practices, to which employees at stores nationwide were subject, and which discriminated on the basis of sex by providing more favorable accommodations to non-pregnant employees than to pregnant employees similar in ability or inability to work, in violation of Title VII as amended by the PDA.

31.     Title VII of the Civil Rights Act of 1964 prohibits discrimination by an employer "against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  The Pregnancy Discrimination Act, enacted in 1978, added new meaning to Title VII's use of the word "sex."  It provided that "because of sex" or "on the basis of sex" includes "because of or on the basis of pregnancy, childbirth, or related medical conditions."  *Id*. § 2000e(k).  The PDA further provides that:

> [W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . .

*Id.*

32.     Many pregnant women experience physical limitations at some point during their pregnancies that impact their ability to complete job tasks associated with some positions at Walmart, including but not limited to lifting heavy objects, standing for long periods of time, squatting or stooping, and climbing ladders.

33.     Up until at least March 2014, including the times during which Ms. Borders and Ms. Woolbright were pregnant, Walmart maintained a constellation of policies and practices governing modifications and accommodations offered to employees in need of changes in the workplace due to health issues.  In creating separate categories for 1) disabilities, 2) pregnancy

or other medical conditions, and 3) work-related injuries, Walmart set up a graduated system of workplace modifications that explicitly excluded pregnant employees from a wide variety of accommodations and adjustments for which non-pregnant employees, similar to pregnant employees in their ability or inability to work, were eligible.

34.     The preamble to the August 21, 2010 Accommodation in Employment – (Medical-Related) Policy (hereinafter the "Prior Accommodation Policy") provided eligibility for workplace modifications to employees in two distinct categories: employees with disabilities and employees with a need for accommodations arising out of pregnancy or other medical conditions.  The preamble stated that, on the one hand, "We will provide associates who have a *disability* with *reasonable accommodations,*" and on the other hand, an associate with "a *medical condition* that is not a disability, but which prevents you from performing your job, [] may be eligible for a *job aid* or *environmental adjustment* under this policy." (emphasis in the original.)

35.     The Prior Accommodation Policy and practices consistent with that policy adversely singled out pregnancy as a "medical condition" categorically ineligible for the accommodations afforded to employees with disabilities, regardless of similarity in ability or inability to work (hereinafter "the Pregnancy Exclusion").  The Pregnancy Exclusion stated that, "You may be eligible for a *job aid* or *environmental adjustment* if you are qualified for the job you hold but, because of a medical condition, <u>including pregnancy</u>, you need assistance to perform the essential function of your job" (emphasis added).  As Walmart explained in a letter to A Better Balance dated January 10, 2014, a "*job aid* or *environmental adjustment*" meant "minor assistance, which may include use of a stool, a water bottle, or minor schedule changes." The Prior Accommodation Policy did not categorize or identify any condition, circumstance or limitation other than pregnancy as either a medical condition or a disability.

36.     The Prior Accommodation Policy and Pregnancy Exclusion stated that the job aids and environmental adjustments available to pregnant employees *exclude*: "creating a job, removing or reducing an essential function of your job, transferring a portion of a job to another associate, light duty, or temporary alternative duty, or reassignment."  Non-pregnant employees with disabilities, on the other hand, were entitled to "reasonable accommodations," *including* reassignment to an open vacant position and "[c]hanging non-essential job functions."  Had Walmart allowed other employees to assist Ms. Borders and Ms. Woolbright with their "non-essential job functions," such as climbing ladders or lifting heavy objects, or had Walmart reassigned Ms. Borders and Ms. Woolbright to open vacant positions, they would not have been harmed as they were.

37.     Further treating pregnant employees as second-class citizens, Walmart's Prior Accommodation Policy and Pregnancy Exclusion required Walmart to address the needs of pregnant employees only under select circumstances.  Walmart's policies and practices provided that the only modifications or adjustments available to pregnant employees were those that would be *both* "easily achievable" and "which will have *no* negative impact on the business" (emphasis added).  Non-pregnant employees with disabilities, on the other hand, were entitled to "reasonable accommodations" so long as the change would not create an "undue hardship" for the company.  As a result of this disparity in its policies and practices, Walmart could deny a pregnant employee any modifications she needed to continue working and maintain a healthy pregnancy even if the adjustments would mean only a *de minimis* cost to Walmart.  These flimsy protections for pregnant employees stood in sharp contrast to the robust protections afforded to non-pregnant employees with disabilities.

38.     Because pregnancy was the only physical condition explicitly excluded from the full panoply of accommodations available under the Prior Accommodation Policy, an employee with any other medical condition was eligible for the fuller range of accommodations if the condition "substantially limit[ed] one or more major life activities."  Pregnancy, however, was unique among physical conditions under the Prior Accommodation Policy in that, by its terms, *regardless* of whether a pregnant employee was substantially limited in one or more major life activities as a result of her pregnancy, only the limited categories of job aids or environmental adjustments were available, and even those modifications had to be easily achievable and without a negative impact on Walmart.  This differential treatment, not based on ability to work, but rather on pregnancy alone, violates Title VII as amended by the PDA.

39.     Walmart also provided accommodations for a third category of employees with limitations, as outlined in a separate document governing modifications for employees injured on the job.  That policy, dated April 13, 2012, and titled Associate Work-Related Injury Policy (SA-01) (hereinafter the "Temporary Alternative Duty Policy"), stated that employees who were injured on the job may be offered temporary alternative duty.  In contrast to the modifications that Walmart made available to employees with limitations arising out of pregnancy, the Temporary Alternative Duty Policy was readily offered to employees injured on the job.  Ms. Woolbright's experience exemplified this disparity—Walmart refused to honor lifting restrictions while she was pregnant, but once she suffered an on-the-job injury, Walmart restricted her lifting duties.  This differential treatment, not based on ability to work, but rather on pregnancy alone, violates Title VII as amended by the PDA.

40.     These policies and practices provide direct evidence of intentional discrimination under the PDA.  Walmart's constellation of policies and practices in effect until at least March

2014 constituted a facial and categorical exclusion of pregnant employees from accommodations available to many non-pregnant employees similar in ability or inability to work.

41.    Under these policies and practices, pregnant employees were neither eligible for nor offered modifications that imposed any cost or inconvenience on Walmart whatsoever, even though many employees with disabilities or on-the-job injuries were eligible for and offered such modifications.

42.    For example, Walmart refused to accommodate Ms. Borders, who was pregnant, when she requested job modifications with regard to lifting heavy boxes and climbing ladders, but Walmart accommodated other employees at the same store who needed accommodations due to non-pregnancy-related conditions, including an employee who had trouble moving her neck and employees who had trouble standing for long periods of time.  Likewise, Ms. Woolbright received the lifting restriction she had needed and requested due to her pregnancy only *after* she was injured on the job.

43.    Even if the Pregnancy Exclusion is not considered direct evidence of discrimination, Walmart's policies and practices demonstrate intentional discrimination on the basis of pregnancy.  Under its constellation of policies and practices, Walmart accommodated a large percentage of non-pregnant employees with physical limitations but failed to accommodate a large percentage of pregnant employees with physical limitations arising out of pregnancy. This is true because pregnant employees were categorically excluded from the broader modifications and reasonable accommodations afforded to non-pregnant employees with disabilities and/or on-the-job injuries.  Regardless of any legitimate, non-discriminatory reason proffered by Walmart, this differential treatment imposed a significant burden on pregnant

12

employees, thus demonstrating that Walmart intentionally discriminated on the basis of pregnancy.

44.    In the alternative, the policies and practices had a discriminatory impact on pregnant employees that was not justified by any business necessity.  According to the U.S. Bureau of Labor Statistics based on logs maintained by employers recording data required by federal law, in 2013 approximately 1% of full-time equivalent retail workers suffered on-the-job injuries resulting in "job transfer or restriction."  *See* BLS News Release, Employer-Reported Workplace Injuries and Illnesses -2013 (Dec. 4, 2014), Table 1, at https://www.bls.gov/news.release/archives/osh_12042014.pdf (last visited May 5, 2017) (providing statistics by industry); BLS, Ch. 9, Occupational Safety and Health Statistics, at 5-15, at https://www.bls.gov/opub/hom/pdf/homch9.pdf (last visited May 5, 2017) (describing survey methodology).  In 2014, Walmart had about 1.2 million employees in the United States. Walmart, 2014 Enhanced Digital Annual Report, at http://www.corporatereport.com/walmart/2014/ar/walmartUS.html (last visited May 5, 2017). Extrapolating this data to Walmart, during the approximately one-year Relevant Time Period, about 12,000 Walmart employees were transferred or worked under job restrictions because of on-the-job injuries.  By contrast, under Walmart's Prior Accommodation Policy and Pregnancy Exclusion, and practices consistent with those policies, no pregnant women would have been transferred or had their job duties restricted because of pregnancy, unless, like Ms. Woolbright, they suffered an injury while performing their unaccommodated job duties and thus received accommodations under a different policy for employees injured on the job.

45.    According to the U.S. Bureau of Labor Statistics based on annual average data obtained from the Current Population Survey (CPS), which obtains data each month from about

60,000 households, in 2014 persons with a disability constituted about 3.4% of all employees in the nation. BLS News Release, Persons with a Disability: Labor Force Characteristics – 2015 (June 21, 2016), Table A at https://www.bls.gov/news.release/pdf/disabl.pdf (last visited May 5, 2017) (calculated by dividing the estimated number of disabled employees (4,985,000) by the estimated number of employees (4,985,000 + 141,320,000)). Extrapolating this data to Walmart, during the Relevant Time Period it employed approximately 40,800 disabled persons, many of whom would have required accommodations. By contrast, under Walmart's Prior Accommodation Policy and Pregnancy Exclusion, and practices consistent with those policies, no women would have been accommodated unless any minor modifications would have imposed no cost or inconvenience on Walmart whatsoever. As discussed below, data suggest that thousands of pregnant women requested and were denied accommodations by Walmart during the Relevant Time Period.

46.    In or around March 2014, just weeks after Ms. Borders filed her charge with the EEOC, Walmart announced changes to its accommodations policy (hereinafter the "Current Accommodation Policy"). The Current Accommodation Policy defines disability to include "a temporary disability caused by pregnancy."

47.    In practice, and by design, the Current Accommodation Policy is regularly applied in practice to refuse accommodations to pregnant employees who have physical limitations arising out of a pregnancy that do not constitute a "disability," despite similar accommodations being afforded to other employees similar in their ability or inability to work, including employees with on-the-job injuries who do not have a "disability." Accordingly, Walmart is still discriminating against pregnant employees under Title VII as amended by the

14

PDA.  However, this Complaint concerns only damages for injuries resulting from Walmart's

Prior Accommodation Policy.

## CLASS ACTION ALLEGATIONS

*Class seeking relief under the Prior Accommodation Policy and Pregnancy Exclusion*

48.    Ms. Borders and Ms. Woolbright incorporate by reference the allegations set forth

in the above paragraphs.

49.    Ms. Borders and Ms. Woolbright bring this class action pursuant to Fed. R. Civ.

P. 23(a) and (b)(3) on behalf of the following class seeking monetary relief under the

constellation of Walmart's prior policies and practices (hereinafter "Prior Policy Class"):

> All females employed by Walmart at stores nationwide who were
> denied requested accommodations because of pregnancy between
> March 19, 2013 and the implementation of the Current
> Accommodation Policy (the "Relevant Time Period under the Prior
> Accommodation Policy"), other than managerial employees and
> employees in Walmart's law and human resources departments.

50.    Ms. Borders and Ms. Woolbright are members of the Prior Policy Class they seek

to represent.

51.    The proposed members of the Prior Policy Class identified herein are so

numerous that joinder of all members is impracticable.  During the Relevant Time Period under

the Prior Accommodation Policy, Walmart employed about 1,200,000 employees.  According to

an expert report in prior litigation against Walmart, about 65 percent of hourly employees at

Walmart are women, while roughly 33 percent of management employees are women.  It is

reasonable to believe that overall about 60% of Walmart employees are women.  *Dukes v. Wal-*

*Mart Stores, Inc.*, 222 F.R.D. 137, 146 (N.D. Cal. June 16, 2004).  As a result, it is likely that

approximately 720,000 of Walmart's employees during the Relevant Time Period were women.

Women are of childbearing age (18 to 50) for about 2/3 of a normal working career (to age 65),

and hence about 480,000 employees were of childbearing age.  According to the Center for

Disease Control, about 10% of women of childbearing age become pregnant each year in the

United States.  Consequently, it is likely that about 48,000 Walmart employees became pregnant

during the Relevant Time Period.

      52.     Only Walmart's own records will reveal the actual number of pregnant employees

who were denied requested accommodations, but a recent survey suggests that the number

probably exceeded 20,000.  In a survey of over 1,000 women who gave birth to single babies in

U.S. hospitals from July 2011 through June 2012, the respondents reported as follows:

| **Type of Accommodation** | **% Needing** | **% Requested** | **% Requested Who Were Denied** |
|---|---|---|---|
| More frequent breaks | 71% | 58% | 5% |
| Change in duties (e.g., less lifting, more sitting) | >50% | 63% | 9% |
| Change in schedule | >50% | 74% | 9% |
| Other accommodation | 40% | 62% | 13% |

National Partnership for Women & Families, Listening to Mothers: The Experiences of

Expecting and New Mothers in the Workplace (Jan. 2014), at

http://www.nationalpartnership.org/research-library/workplace-fairness/pregnancy-

discrimination/listening-to-mothers-experiences-of-expecting-and-new-mothers.pdf.  If pregnant

employees at Walmart needed, requested, and were denied accommodations at the survey

averages, there are at least several thousand members of the Prior Policy Class.  Thus, there are

far too many potential class members, who are scattered all across the country, to be reasonably

joined.

      53.     Questions of law and fact are common to the Prior Policy Class, and these

questions predominate over any questions that may affect only individual class members.  The

proposed class is particularly cohesive because it pertains to a very specific set of policies and

practices adopted by corporate and senior management and applicable to employees at stores nationwide. Questions of law and fact that are common to all members of the Prior Policy Class are: (1) whether the Pregnancy Exclusion's consignment of pregnancy to the category of "medical condition," thereby limiting the types of accommodations available to pregnant employees, is facially discriminatory; (2) whether pregnant employees, who were denied the full range of accommodations, were similar in their ability or inability to work compared to other employees offered a fuller range of accommodations; (3) whether Walmart denied pregnant employees certain forms of accommodations available to other employees, similar in their ability or inability to work, on the basis that it would be too costly or inconvenient for Walmart to provide accommodations to pregnant employees; (4) whether the Prior Accommodation Policy and Pregnancy Exclusion accommodated a large percentage of non-pregnant employees but denied accommodations to a large percentage of pregnant employees; (5) whether the Prior Accommodation Policy and Pregnancy Exclusion imposed a significant burden on pregnant employees that outweighs any legitimate, non-discriminatory reason proffered by Walmart; (6) whether the Prior Accommodation Policy and Pregnancy Exclusion had a statistically significant adverse impact on pregnant employees and thus women; and (7) whether Walmart had a business need to adopt the Prior Accommodation Policy and Pregnancy Exclusion.

54.    These common questions can be answered with common proof, including but not limited to: (a) the existence of discriminatory, written policies and practices applicable to employees at stores nationwide; (b) training materials provided to human resource employees and managers about the application of those policies and practices, (c) statistical evidence of disparities adverse to pregnant employees and thus women resulting from these common policies and practices; and (d) the use of common experts.

55.     The claims of Ms. Borders and Ms. Woolbright are typical of the claims of the Prior Policy Class.  Specifically, Ms. Borders and Ms. Woolbright were pregnant during the Relevant Time Period under the Prior Accommodation Policy and Pregnancy Exclusion; they have been subjected to and damaged by company-wide policies and practices of sex and pregnancy discrimination in employment; their claims are based upon allegations that they have been adversely affected by those policies and practices in that they received less favorable treatment with respect to workplace accommodations than their male and non-pregnant counterparts similar in their ability or inability to work; and their claims rest on proof and legal theories common to all proposed class members.

56.     Ms. Borders and Ms. Woolbright, as Representative Plaintiffs, will fairly and adequately represent and protect the interests of the members of the Prior Policy Class because: (1) they are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion; (2) their interests are not antagonistic to those of the other class members; and (3) they are represented by counsel experienced in litigating major class actions in the field of employment discrimination.

57.     Class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Prior Policy Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The class members have been damaged and are entitled to recovery as a result of Walmart's common, uniform, and discriminatory policies and practices.  Further, the class members were subjected to the same company-wide policies and practices of sex and pregnancy discrimination and, therefore, requiring each class member to pursue her claim individually would result in needless

duplication of proof and would waste the resources of both the parties and the judiciary. Finally, monetary relief would be easily calculable for the financial injuries suffered by Prior Policy Class members, consisting of the number of days of work missed because of Walmart's failure to accommodate their pregnancy times their pay rates, plus any lost wages after their pregnancies, such as those experienced by Ms. Borders and Ms. Woolbright.

## CAUSES OF ACTION

### COUNT I

### INTENTIONAL DISCRIMINATION ON THE BASIS OF SEX
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*,
as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k)
(On Behalf of Ms. Borders, Ms. Woolbright, and the Prior Policy Class)**

58.     On behalf of themselves and the Prior Policy Class, Ms. Borders and Ms. Woolbright incorporate by reference the allegations set forth throughout this Complaint.

59.     Ms. Borders, Ms. Woolbright, and members of the Prior Policy Class are female and are, or were, employees of Walmart at stores nationwide within the meaning of 42 U.S.C. §2000e *et seq*. and thus are members of a protected class.

60.     Walmart's Prior Accommodation Policy and Pregnancy Exclusion, as set forth herein, and practices consistent with those policies, denied Ms. Borders, Ms. Woolbright, and members of the Prior Policy Class their right to equal employment opportunity in violation of Title VII and the PDA's requirement that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ." 42 U.S.C. § 2000e(k).

61.     Walmart's Prior Accommodation Policy and Pregnancy Exclusion constitute direct evidence of intentional discrimination against pregnant employees in that Walmart

adopted, implemented, and maintained uniform employment policies and practices that singled out pregnancy on their face and categorically excluded pregnant employees from eligibility for the same accommodations that similarly situated non-pregnant employees could enjoy, thereby demonstrating intent to discriminate against pregnant employees.

62.    Alternatively, even if Walmart's Prior Accommodation Policy and Pregnancy Exclusion are not considered direct evidence of intentional discrimination, they were nonetheless *prima facie* discriminatory because, pursuant to these policies and practices, Walmart refused to accommodate pregnant employees but accommodated other non-pregnant employees, despite their similarity in ability or inability to work.  The Prior Accommodation Policy and Pregnancy Exclusion, and practices consistent with those policies, imposed a significant burden on pregnant employees, in that Walmart provided a full range of accommodations to a large percentage of non-pregnant employees in need of accommodations while failing to provide those same accommodations to a large percentage of, or any, pregnant employees in need of accommodations unless Walmart first caused them injury while on the job. Walmart did not have a legitimate, non-discriminatory reason for treating pregnant and non-pregnant employees differently in this way, but even if Walmart was able to present such a reason, the significant burden imposed outweighs that reason.

63.    Walmart's discriminatory policies and practices caused Ms. Borders, Ms. Woolbright and members of the Prior Policy Class to suffer injury, including but not limited to, loss of wages and other job benefits, and emotional and physical distress.

64.    On behalf of themselves and the Prior Policy Class, Ms. Borders and Ms. Woolbright request monetary relief as provided in the Prayer for Relief below.

**COUNT II**

## DISPARATE IMPACT DISCRIMINATION ON THE BASIS OF SEX
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*,
### as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k)
### (On Behalf of Ms. Borders, Ms. Woolbright, and the Prior Policy Class)

65.    On behalf of themselves and the Prior Policy Class, Ms. Borders and Ms. Woolbright incorporate by reference the allegations set forth throughout this Complaint.

66.    Walmart's Prior Accommodation Policy and Pregnancy Exclusion constitute disparate impact discrimination against female employees in that Walmart adopted, implemented, and maintained uniform employment policies and practices that categorically excluded pregnant employees from eligibility for the same accommodations that similarly situated non-pregnant employees could enjoy, and thus female employees were disproportionately denied accommodations and excluded.  The policies and practices had a discriminatory impact on pregnant employees, and thus women, which was not justified by any business necessity.

67.    Walmart's discriminatory policies and practices caused Ms. Borders, Ms. Woolbright and members of the Prior Policy Class to suffer injury, including but not limited to, loss of wages and other job benefits, and emotional and physical distress.

68.    On behalf of themselves and the Prior Policy Class, Ms. Borders and Ms. Woolbright request monetary relief as provided in the Prayer for Relief below.

### COUNT III

## EMPLOYMENT DISCRIMINATION – RETALIATION
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3
### (On behalf of Ms. Borders and Ms. Woolbright individually)

69.    Ms. Borders and Ms. Woolbright incorporate by reference the allegations set forth throughout this Complaint.

70.    After Ms. Borders provided Walmart a note from her doctor disclosing her pregnancy and setting forth her resulting physical restrictions, she requested modifications from both her manager in the Pharmacy Department and the Human Resources Training Coordinator, constituting protected activity pursuant to 42 U.S.C. § 2000e-3.

71.    Immediately after Ms. Borders requested appropriate modifications, Walmart retaliated by forcing her to take an unpaid leave of absence despite her request to continue working during her pregnancy.  Walmart did not engage Ms. Borders in any discussion about what modifications would address her restrictions.  Rather, Walmart forced Ms. Borders to take unpaid leave for over two months before she gave birth.

72.    Walmart continued to retaliate against Ms. Borders after she returned to work following the birth of her child.  Walmart refused to reinstate her in the Pharmacy Department, but rather repeatedly moved Ms. Borders around the store to different departments.  In addition, Walmart refused to pay her the same wage she had received before she became pregnant and requested modifications.

73.    Ms. Woolbright's request on January 12, 2014, for information concerning Walmart's policies on taking leave for childbirth constituted protected activity pursuant to 42 U.S.C. § 2000e-3.

74.    Walmart fired her the day after she made this inquiry about information concerning Walmart's policies on taking leave for childbirth.  The firing was in retaliation for the accommodation requests she had made earlier in her pregnancy, the accommodations that she had received under temporary alternative duty, and her inquiry about leave.

75.    Ms. Borders and Ms. Woolbright suffered injuries as a direct and proximate result of Walmart's retaliatory conduct, including loss of income, emotional distress, and humiliation.

76.     Ms. Borders and Ms. Woolbright request relief as provided in the Prayer for Relief below.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Ms. Borders, Ms. Woolbright, and the proposed class members respectfully request that this Court enter a judgment:

a.      Declaring that the practices complained of herein are unlawful and violate Title VII as amended by the PDA;

b.      Providing compensation to Ms. Borders, Ms. Woolbright, and the Prior Policy Class for physical and mental injuries sustained as a result of Walmart's unlawful conduct, including compensation for loss of income and benefits, mental anguish, emotional distress, and humiliation;

c.      Providing compensation to Ms. Borders and Ms. Woolbright individually for physical and mental injuries sustained as a result of Walmart's retaliatory conduct, including compensation for loss of income and benefits, mental anguish, emotional distress, and humiliation;

d.      Providing costs and expenses incurred in investigating and litigating the claims, including reasonable attorneys' fees to the extent allowable by law;

e.      Providing pre- and post-judgment interest, as provided by law, as well as damages to offset any tax consequences to Ms. Borders, Ms. Woolbright, and the Prior Policy Class; and

f.      Providing such other and further legal and equitable relief as this Court deems necessary, just, and proper.

Respectfully Submitted,

*/s Donna L. Harper*

**SEDEY HARPER WESTHOFF P.C.**

Mary Anne Sedey #26731MO
Donna Harper #26406MO
2711 Clifton Avenue,
Saint Louis, MO 63139
Telephone: 314-773-3566
msedey@sedeyharper.com
dharper@sedeyharper.com

**MEHRI & SKALET, PLLC**

Cyrus Mehri (*pro hac vice* pending)
Michael D. Lieder (*pro hac vice* pending)
U.W. Clemon (*pro hac vice* pending)
Brett D. Watson (*pro hac vice* pending)
1250 Connecticut Avenue, NW, Suite 300
Washington, DC 20036
Telephone: 202-822-5100
cmehri@findjustice.com
mlieder@findjustice.com
jclemon@findjustice.com
bwatson@findjustice.com

**A BETTER BALANCE**

Dina Bakst (*pro hac vice* pending)
80 Maiden Lane, Suite 606
New York, NY 10038
Telephone: 212-430-5982
dbakst@abetterbalance.org

Elizabeth Gedmark (*pro hac vice* pending)
2301 21st Ave S., Suite 355
Nashville, TN 37212
Telephone: 615-915-2417
egedmark@abetterbalance.org

**NATIONAL WOMEN'S LAW CENTER**

Emily Martin (*pro hac vice* pending)
Andrea Johnson (*pro hac vice* pending)
11 Dupont Cir NW, Suite 800
Washington, DC 20036
Telephone: 202-588-5180
emartin@nwlc.org
ajohnson@nwlc.org

***ATTORNEYS FOR PLAINTIFFS***