# EXHIBIT A

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BORDERS et al., on behalf of themselves and all others similarly situated, Plaintiffs, | Civil No. 3:17-cv-00506 |
| v. | CLASS ACTION |
| WALMART STORES, INC., Defendant. | |

## DECLARATION OF ELLEN L. EARDLEY

I, Ellen L. Eardley, declare upon personal knowledge and under penalty of perjury that the following is true and correct:

1. I make all of the statements below based on personal knowledge, in some instances after reviewing my law firm's records to refresh my recollection as to specific dates and docket entries related to this litigation.

2. I am a partner law firm of Mehri & Skalet, PLLC ("M&S") with offices in Washington, D.C. I serve on the firm's management team. Founded in 2001, M&S primarily represents employees, consumers, and whistleblowers in class action and other high-impact cases across the country. Lawyers in our firm have decades of experience representing plaintiffs in dozens of class and collective actions in a variety of fields, including civil rights, employment discrimination, wage and hour, and consumer fraud. Employment class actions is the firm's single largest area of practice.

**History of the Case**

3. Our co-counsel at the non-profit organizations A Better Balance ("ABB") and the National Women's Law Center ("NWLC") are national experts on pregnancy discrimination in

the workplace. They approached M&S in 2013 to work with them on a pregnancy discrimination case against Walmart after they were contacted by Plaintiff Talisa Borders. My firm is a well-known civil rights firm that regularly handles complex litigation, and I had previously worked at the NWLC. Local counsel is Sedey Harper Westhoff, P.C. in St. Louis, MO.

4.  In 2013, Ms. Borders sought counsel to address pregnancy discrimination she had experienced while working at a Walmart store in O'Fallon, Illinois in 2013. Upon connecting with Ms. Borders, ABB, NWLC, and M&S ("Class Counsel") began an investigation of her individual claims and potential class claims. At that time, Class Counsel believed that there had been no previous class action lawsuits alleging that an employer's systemic failure to accommodate pregnant workers violated the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). It was therefore necessary to carefully assess the applicable case law, including the risks associated with pursuing a gender-related class action against Walmart after *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). Because a class pregnancy accommodation case has rarely, if ever, been litigated under Rule 23, the case presented many novel issues.

5.  In January 2014, Class Counsel helped Ms. Borders file a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") in the St. Louis, Missouri, District Office alleging that Walmart engaged in sex and pregnancy discrimination against her and a class of pregnant workers by, among other things, maintaining a written Accommodation in Employment policy that denied pregnant workers light duty, temporary alternative duty, and other accommodations available to other workers, not pregnant, similar in their ability or inability to work, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e *et seq.* Later in the

litigation, Plaintiffs referred to this policy as the "National Policy" after Plaintiffs learned there were also several state policies.

6. Shortly after Ms. Borders filed her charge, on March 5, 2014, Walmart changed the National Policy at issue in this case. *See, e.g.,* Lydia DePillis, *Under Pressure, Wal-Mart Upgrades Its Policy for Helping Pregnant Workers*, Washington Post, Apr. 5, 2014, available at https://www.washingtonpost.com/news/wonk/wp/2014/04/05/under-pressure-walmart-upgrades-its-policy-for-helping-pregnant-workers/ (last visited Oct. 2, 2019). But, Walmart did not resolve Ms. Borders's claims at that time. My co-counsel and I remained concerned about the impact of Walmart's National Policy and state policies on workers who were pregnant from March 19, 2013 through March 5, 2014.

7. Plaintiff Woolbright also retained Class Counsel regarding a similar claim of pregnancy discrimination pending before the EEOC.

8. While Plaintiffs' EEOC charges were pending, Class Counsel continued an extensive investigation into Plaintiffs individual and class claims and continued to interview pregnant Walmart workers. Plaintiffs and Class Counsel also worked with the EEOC, by way of providing documents and participating in interviews. Eventually, the EEOC issued the Notice of Right to Sue for Ms. Woolbright on February 14, 2017 and for Ms. Borders on May 17, 2017.

9. This class action lawsuit was filed on May 12, 2017, Dkt. 1. The complaint alleged class claims of intentional and disparate impact pregnancy discrimination in violation of the PDA, as well as individual retaliation claims in violation of 42 U.S.C. § 2000e. *See* Compl. ¶¶ 58-76. It described the discriminatory provisions of Walmart's National Policy, under which pregnant workers were expressly ineligible for light duty or reasonable accommodation even though these supports were available to other workers. *Id.* at ¶¶ 34-41.

10. On November 15, 2018, Class Counsel sought to amend the complaint to add the individual and class claims of Plaintiff Stacey Lewis whose claims are similar to Plaintiffs Borders and Woolbright's claims. Plaintiff Lewis had contacted and retained Class Counsel after learning about a *New York Times* article regarding pregnancy discrimination by Walmart that discussed Plaintiff Woolbright's experiences. Natalie Kitroeff and Jessica Silver-Greenberg, *Pregnancy Discrimination is Rampant Inside America's Biggest Companies*, N.Y. Times, June 15, 2018 available at https://www.nytimes.com/interactive/2018/06/15/business/pregnancy-discrimination.html (last visited Oct. 2, 2019).

11. The litigation was hotly contested by the parties and zealously pursued by Class Counsel. On July 31, 2017, Walmart moved to dismiss Plaintiff Woolbright's claims for lack of personal jurisdiction, and to dismiss the case altogether for failure to state a claim. Dkts. 15, 17. Shortly thereafter, Walmart filed a motion to stay discovery pending the Court's ruling on the motions to dismiss. Dkt. 43. Class Counsel vociferously opposed all three motions. Dkts. 46, 47, 54. Following full briefing, the Court denied Walmart's motions to dismiss in their entirety. Dkt. 84. The motion to stay discovery was denied as moot. Dkt. 86.

12. Class Counsel thereafter zealously pursued discovery from Walmart regarding Walmart's National Policy, as well as several state-wide policies pertaining to accommodation in the workplace from 2013-2014, and the impact of such policies on pregnant employees and employees similar in their ability to work. Class Counsel served requests for admissions, interrogatories, and requests for production of documents and took Rule 30(b)(6) depositions of Walmart, as well as depositions of fact and expert witnesses. There were 15 total depositions.

13. Counsel for the parties engaged in regular conferences pursuant to the Federal Rules over discovery disputes regarding Plaintiffs' request for production of documents and

interrogatories. Eventually, Class Counsel obtained and analyzed thousands of pages of responsive documents, as well as detailed workforce databases.

14. To better understand Walmart's workforce data and to provide a methodology for calculating class damages, Class Counsel retained two labor economists as experts. Class Counsel, their expert, and their teams spent hundreds of hours deciphering Walmart workforce data, identifying holes in the data, developing new discovery requests to supplement the data, engaging in data entry to simplify the data, and developing pioneering approaches for assessing workforce pregnancy accommodation data. At the time the experts were developing their analyses, Class Counsel and the experts knew of no other litigation in which workforce data regarding pregnancy accommodation was assessed on a classwide basis. Walmart retained its own expert to review the workforce data, and the parties exchanged three initial expert reports and two rebuttal reports. Plaintiffs also submitted a supplemental expert report. The expert reports provided complex statistical analyses, including regression analyses, regarding pregnant workers' experiences. Expert analysis of liability and damages was a critical component of this unique class case.

15. Class and expert discovery continued through March 2019. By April 30, 2019, Class Counsel had prepared and were ready to file a motion and supporting papers seeking class certification pursuant to Rule 23, but the filing deadline was extended when parties opted to undertake class-wide settlement negotiations.

16. The parties had engaged in their first meaningful exploration of settlement negotiations in November and December 2018 with the assistance of Michelle Yoshida of Phillips ADR, who had presided over a one-day, in-person mediation in December 2018. The parties had exchanged confidential mediation briefs in November 2018 and had discussed potential resolution of Plaintiffs' class claims. Settlement counsel, rather than litigation counsel, represented Walmart

at the mediation. The parties were unable to reach an agreement in December 2018 and decided that negotiations should be suspended pending further prosecution of the case including the exchange of expert reports regarding the class-wide claims and expert depositions.

17. After the exchange of expert reports and deposition of all three experts, the parties resumed mediation on May 23, 2019, with the assistance of Ms. Yoshida. On June 12, 2019, the parties notified the Court that they had reached a settlement in principle. The parties executed a memorandum of understanding shortly thereafter and spent several months negotiating the terms of the class action settlement agreement. The settlement was fully executed on October 14, 2019.

**The Settlement Agreement**

18. The Settlement Agreement and Plaintiffs' Memorandum in Support of the Motion for Preliminary Approval—attached to Plaintiffs' Motion for Preliminary Approval—set forth the details of the settlement. *See* Dkt. 132.

19. In brief, the settlement requires Walmart to pay $14,000,000 for the benefit of two Settlement Classes who were pregnant and denied workplace accommodations between March 19, 2013 and March 5, 2014. Walmart is further required to separately pay (1) the employer's portion of taxes or contributions for any backpay awarded through the settlement; and (2) for distribution of notice to the state attorneys general as required by the Class Action Fairness Act, 28 U.S.C. § 1715.

20. Each Class Member is entitled to submit a claim for a share of the Settlement Fund less the cost of Settlement Administration Expenses and Class Counsel's fees and expenses. Claims will be reviewed by an experienced, neutral claims administrator who will objectively score the claims. The point system devised by the claims administrator will be based on information provided on the claim forms regarding class members' damages, class members'

contributions to the litigation, and whether the individual is releasing claims other than pregnancy discrimination. After all claims have been submitted, the total number of points assigned to valid claims will be divided by the total amount of settlement funds available and each point will be assigned a monetary value. Thus, every valid claimant will share in the settlement, but claimants will receive varying award amounts depending on their scores.

21. Notice and administration through A.B. Data, Ltd. is expected to cost less than $200,000. Assuming that the Court grants counsel's motion for fees of 33.33% of the common fund plus $275,000 in expenses, and assuming that there are in fact 11,000 settlement class members, the average award per person will be about $1,639.39 if half of the estimated class members submit valid claims, and about $2,049.24 if 40% submit valid claims. Of course, if the claims rate is lower or if there are fewer class members than Class Counsel estimated, then the average award will be even higher.

22. Notably, the Settlement is completely non-reversionary—all unclaimed or undistributed amounts remaining in the Settlement Fund after all payments under the Settlement Agreement will, to the extent administratively feasible, be redistributed to the Settlement Class.

**Retainer Agreements**

23. At the outset of each Plaintiffs involvement in the case, M&S prepared retainer agreements for Plaintiffs review and signature. All plaintiffs signed the agreements.

24. With respect to attorney fees and expenses, the retainer agreements provide that, "[i]f there is a recovery from Walmart, [Class Counsel] may choose between three forms of compensation for its legal services:

> (1) [Class Counsel] collectively will be entitled to expenses and up to one-third (33.33%) of any 'gross recovery' for [Named Plaintiff] and any Class ("contingency fee"). 'Gross recovery' means the total of all amounts received prior to reimbursement of expenses.

7

OR

(2) [Class Counsel] will be entitled to expenses and the number of hours worked multiplied by a reasonable hourly rate, plus any applicable fee award enhancements. [Class Counsel's] current rates are attached . . . hereto, but those rates may change from time to time.

OR

(3) [Class Counsel] will be entitled to expenses and reasonable attorneys' fees awarded by a Court or paid in settlement."

25. This provision for attorneys' fees is standard in my experience at M&S. In every class case in which I have been involved at the firm, the retainer agreement has provided for a contingency fee of one-third of the recovery.

**Mehri & Skalet's Staffing & Attorney Experience**

26. I have been involved with the case since M&S began investigating this case with ABB and NWLC in 2013. I have been the primary lawyer at the firm working on the case since shortly after the lawsuit was filed in May 2017. Partner Michael Lieder, who has experience working with workforce data and complex statistical analyses, played a major role in expert discovery. Cyrus Mehri, one of the firm's co-founders, has provided oversight and participated largely in case strategy sessions, as well as mediation and settlement. For most of the case, I was responsible for coordinating case assignments and tasks within the firm and among co-counsel. In making assignments and coordinating work, I avoided duplication to the extent possible, I matched the complexity of the task with the experience of the team member, and I utilized each team member's strengths to best serve our clients and the class.

27. For the most part, my firm had a single associate staff the case at a time. Brett Watson staffed the case from September 2015 to September 2017. Joanna Wasik took over thereafter and worked on the case between April 2018 to March 2019. Lauren Nussman joined

the team in October 2018. Ms. Wasik and Ms. Nussman temporally overlapped for five months (October 2018-March 2019) during an intense phase of discovery, preliminary settlement discussions, preparing for expert reports and depositions, and preparing the brief in support of the motion for class certification. Aisha Rich has staffed the case since December 2019, when Ms. Nussman went on parental leave. Two other M&S attorneys, as well as three paralegals and three law clerks, had limited roles on this case. Partner Craig Briskin participated in the initial investigation of Plaintiff Borders' claims and edited the ESI protocol. Associate Ezra Bronstein researched the discrete issue of discovery regarding emotional distress. Law clerks assisted with document review and isolated legal research on the topics of personal jurisdiction and compensatory damages.

28.   I have been practicing law for over sixteen years. In addition to a law degree, I hold a master's degree in Women's Studies from the University of Cincinnati and an undergraduate minor in Women's Studies from Eastern Illinois University. I have been an attorney at M&S for a collective 9.75 years; first as an associate and later as a partner and member of the firm's management team. I have extensive civil rights class action experience and have served as class counsel for several gender discrimination class actions on behalf of women workers under Title VII of the Civil Rights Act of 1964. *See Augst-Johnson v. Morgan Stanley & Co.*, No. 1:06-CV-01142 (D.D.C.) ($46 million settlement and programmatic relief on behalf of female financial advisors); *Norflet v. John Hancock Life Insurance*, No. 3:04-CV-01099 (D. Conn.) ($24.4 million settlement of behalf of African Americans denied equal opportunity in the sale of life insurance); *Carter v. Wells Fargo Advisors, LLC*, No. 1:09-CV-01752 (D.D.C.) ($32 million settlement and similar injunctive relief); *Brown v. Medicis Pharmaceutical Corp.*, No. l:13-CV-01345 (D.D.C.) ($7.15 million settlement in gender discrimination class action, including hostile work

environment claims); *Howard v. Cook County Sheriff's Office*, No. 1:17-CV-08146 (N.D. Ill.) (certified sexual harassment class action on behalf of women who work at the Cook County Jail complex).

29. I began my career as a fellow and counsel at the National Women's Law Center. I have represented individuals and small groups of employees and consumers in race, gender, and pregnancy discrimination matters in private practice. For instance, several years ago, I represented an individual worker in her pregnancy discrimination claims against a large retailer before the District of Columbia Commission on Human Rights. I also served as the Assistant Vice Chancellor for Civil Rights & Title IX at the University of Missouri, where among other projects, I convened a working group to develop policies regarding pregnancy accommodations for graduate and undergraduate students. Notably, in *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338 (2015), I authored an amicus brief to the Supreme Court joined by 50 state and local legislators, in support of Peggy Young's challenge to UPS's refusal to accommodate her medical needs during pregnancy and interpreting the Pregnancy Discrimination Act. I currently volunteer with First Shift Justice Project, a non-profit organization in Washington, DC that empowers low-income pregnant women and parents to safeguard the economic security and health of their families by asserting their workplace rights.

30. Mr. Lieder has been practicing law for thirty-five years. After serving for over a decade as a partner at Sprenger & Lang, a firm with a practice similar to M&S's, Mr. Lieder joined M&S in 2012 and since then has worked primarily on employment discrimination class action and FLSA collective action matters. He has served as lead counsel or in another leading role in numerous major employment discrimination class actions, including *Medicis*, referenced above, as well as a systemic hostile work environment class action on behalf of women workers at a

federal prison, *White v. Lynch*, EEOC No. 510-2012-00077X (EEOC Dec. 8, 2017) (granting final approval of class action settlement of $20 million plus injunctive relief to address sexual harassment). *See also Thornton v. Nat'l R.R. Passenger Corp.*, No. 1:98-CV-00890 (D.D.C.) ($16 million plus broad injunctive relief in race discrimination class action); *McLaurin v. Nat'l R.R. Passenger Corp*, 1:98-CV-02019 (D.D.C.) ($8 million plus broad injunctive relief in race discrimination class action); *Hyman v. First Union Corp.*, No. 94-1043 (D.D.C.) ($58.5 million in age discrimination collective action); *In re PEPCO Employment Litig.*, No. 860603, 1993 U.S. Dist. LEXIS 7905 (D.D.C.) (June 8, 1993) ($38.4 million and broad injunctive relief). Before coming to M&S, Mr. Lieder led or co-led numerous employment class action lawsuits, including a gender hostile environment, pay, and promotion case, *Carlson v. C.H. Robinson Worldwide, Inc.* No. 02-CV-3780 (D. Minn.), and had a role in the first successful sexual harassment class action in federal court, *Jenson v. Eveleth Taconite Co.,* 824 F. Supp. 847 (D. Minn. 1993). Mr. Lieder was also class counsel in *In re TV Writers Cases*, No. 268836 (Cal. Sup Ct. 2011), a prominent age discrimination class action that settled for $70 million. He has received numerous awards and recognition over the years, including identification as one of "500 Leading Plaintiffs' Lawyers in America" by Lawdragon magazine.

31. Mr. Mehri has been practicing law for thirty years. He is one of the co-founders of M&S. Mr. Mehri litigates cases involving discrimination, civil and consumer rights, and corporate fraud. Among the dozens of employment class actions that he has led or co-led to successful conclusions are some of the country's largest and most significant race and gender cases, including *Roberts v. Texaco Inc.*, No. 94-CV-02015 (S.D.N.Y), *Ingram v. Coca-Cola Co.*, No. 98-CV-03679 (N.D. Ga), *Augst-Johnson v. Morgan Stanley & Co. Inc.*, No. 06-CV-01142 (D.D.C.), *Amochaev v. Citigroup Global Markets, Inc., d/b/a Smith Barney*, No. C051-298 (N.D. Cal.), and *Carter v.*

11

*Wells Fargo Advisors LLC*, No. 09-CV-01752 (D.D.C). These settlements feature sweeping injunctive relief, including the appointment of independent task forces or settlement monitors, as well as tens of millions of dollars of monetary relief. His influence reaches beyond litigation. Based on a report that he and Johnnie L. Cochran, Jr. co-authored, the National Football League adopted the "Rooney Rule," a diversity program under which the NFL has reached historical numbers of black head coaches and management personnel. Through a non-profit he co-founded, Mr. Mehri continues to advocate for implementation of the Rooney Rule and other matters furthering diversity for the NFL. Mr. Mehri also has served on the Cornell Law School Advisory Council and received the Law School's Public Service Award.

32. Brett Watson has been practicing law for six years. He joined M&S in 2015 and departed the law firm in 2017. During his time at M&S he was assigned to cases in the firm's civil rights, wage and hour, and consumer rights practice areas. Prior to joining M&S, Mr. Watson was the Disability Rights Fellow at Brown, Goldstein & Levy LLP.

33. Joanna Wasik has been practicing law for seven years. Ms. Wasik joined M&S in 2015 and departed the law firm in July 2019. During her time at M&S, she worked on a number of class-action suits representing plaintiffs in the civil rights and consumer protection contexts. *See, e.g.*, *Brown v. Medicis Pharmaceutical Corp.*, No. l:13-cv-01345 (D.D.C. July 11, 2016). Before joining M&S, Ms. Wasik worked in the litigation department of Freshfields, Bruckhaus, Deringer US LLP in New York and clerked for the Honorable J. Curtis Joyner at the U.S. District Court for the Eastern District of Pennsylvania. She currently works on employment justice issues for the Washington Lawyers' Committee for Civil Rights and Urban Affairs.

34. Lauren Nussbaum has been practicing law for five years. Since joining M&S in 2018, she has worked on various class matters representing plaintiffs in the civil rights and

12

employment contexts, including a putative class of female employees who experienced a pattern of sexual harassment at Cook County Jail, *see Howard v. Cook County Sheriff's Office*, No. 1:17-CV-08146 (N.D. Ill.), a putative class of African American civilian employees of the New York Fire Department who experienced racial discrimination in promotions and compensation, *see Richardson v. City of New York*, No. 1:17-CV-09447 (S.D.N.Y.), and a putative class/collective of medical professionals alleging Fair Labor Standards Act and associated state wage and hour claims against Metropolitan Life Insurance Company, *see McNeely v. MetLife*, No. 1:18-CV-00885 (S.D.N.Y.).  Prior to joining M&S, Ms. Nussbaum clerked for the Honorable Reggie B. Walton at the U.S. District Court for the District of Columbia and for the Honorable Patrick L. Woodward of the Court of Special Appeals of Maryland.

35.     Aisha Rich has been practicing law for four years.  She joined M&S in November 2019.  Prior to joining M&S she worked as an Assistant District Attorney for the Philadelphia District Attorney's Office.  She also clerked for the Honorable Amalya L. Kearse of the United States Court of Appeals for the Second Circuit, the Honorable Edmond E. Chang of the United States District Court for the Northern District of Illinois, and the Honorable Leondra R. Kruger of the Supreme Court of California.

**Billing Practices**

36.     Several years ago, M&S's founders (Mr. Mehri and Steven Skalet) decided to set the billing rates for all M&S attorneys, paralegals, and law clerks to approximate the LSI Laffey Matrix, generally to within $5 per hour.  In rejecting a district court decision earlier this year that had used a different matrix to set attorney billing rates for complex litigation in Washington, D.C., the D.C. Circuit recently upheld the Laffey Matrix and the methods used to compile it but urged plaintiff and defense lawyers to "produce a reliable assessment of fees charged for complex federal

13

litigation in the District." *DL v. District of Columbia*, 924 F.3d 585, 594 (D.C. Cir. 2019). Pending agreement on an updated matrix, M&S continues to use rates approximating LSI Laffey Matrix rates for all its timekeepers, including when they bill on an hourly basis rather than contingently. Our then-current hourly rates have been approved by federal courts around the country.

37. All lawyers, paralegals, and law clerks at M&S are required to record their time worked on each matter each day to the nearest tenth of an hour in a computerized program called Timesolv. I reviewed a printed report of the time records for this case from the inception of the matter through December 31, 2019 multiple times and exercised billing judgment to eliminate time that seemed excessive or otherwise inappropriate to bill. A copy of the report summarizing the hours not eliminated is attached as Exhibit 1, reflecting a total lodestar for M&S of $2,117,751.

38. As described below, M&S advanced all of the major litigation costs in this case such as expert costs and fees, mediator costs and deposition transcripts. M&S employees who incur expenses for which they seek reimbursement must submit documentation of the expense plus the matter on which the expense was incurred to an accountant. I reviewed a report of the accountant's records of the expenses charged to this case and eliminated a few records, such as those that were accidentally duplicated or those that were erroneously recorded. A summary of the resulting report is included in Exhibit 1, reflecting total M&S expenses of $249,883.44. M&S took on the lion's share of the costs incurred for this case. The firm spent $182,822.37 on the fees and expenses of the two expert labor economists, Dr. Alex Vekker and Dr. Marc Bendick, whose analyses of Walmart's workforce data were critical to settlement; $9,400, which was one-fourth of the cost, to retain Michelle Yoshida of Phillips ADR for mediation; $31,913.38 on depositions and discovery; $17,167.48 on travel to depositions, mediation, and for court appearances; $4,663.14 to perform electronic research; $2,250.83 on printing and mail; $1,000.00 on court costs;

$370.66 on conference calls with clients, co-counsel, and opposing counsel; and $285.58 for other miscellaneous services necessary to the litigation.

39. My firm will continue to dedicate substantial work on this case throughout 2020 expending attorney time and incurring costs. Our work will include coordinating with the claims administrator, responding to inquiries from potential class members, advising the Plaintiffs, communicating with opposing counsel, preparing the motion for final approval of the settlement, and representing the Plaintiffs and the class at the final fairness hearing in Benton, Illinois. I anticipate that additional expenses will include administrative costs, such as printing, and travel expenses for attending the fairness hearing.

40. If the Court grants the motion for fees' and costs and the forthcoming motion for final approval of the settlement, Class Counsel will submit a summary of actual costs incurred after December 31, 2019 so that the trustee of the settlement fund can reimburse Class Counsel for $258,135, plus the additional actual costs incurred not to exceed $275,000 in costs in total.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed On ____1/13/20____

_____
Ellen L. Eardley

# EXHIBIT 1

# EXHIBIT 1

# SUMMARY OF MEHRI & SKALET, PLLC FEES & EXPENSES

| Name | Hours | Rate | Total |
|---|---|---|---|
| | | | |
| **Partners** | | | |
| Ellen Eardley | 1246.10 | $740.00 | $922,114.00 |
| Michael Lieder | 470.60 | $895.00 | $421,187.00 |
| Cyrus Mehri | 262.00 | $895.00 | $234,490.00 |
| Craig Briskin | 45.50 | $895.00 | $40,722.50 |
| | | | |
| **Associates** | | | |
| Joanna Wasik | 493.20 | $455.00 | $224,406.00 |
| Brett Watson | 212.90 | $455.00 | $96,869.50 |
| Lauren Nussbaum | 134.90 | $455.00 | $61,379.50 |
| Aisha Rich | 19.80 | $455.00 | $9,009.00 |
| Ezra Bronstein | 17.70 | $455.00 | $8,053.50 |
| | | | |
| **Paralegals & Law Clerks** | | | |
| Anthony Carter | 226.90 | $200.00 | $45,380.00 |
| Lee-Ann Foster | 188.10 | $200.00 | $37,620.00 |
| Arish Ali | 37.70 | $200.00 | $7,540.00 |
| Andrew Fabianczyk | 34.90 | $200.00 | $6,980.00 |
| Sama Kahook | 10.00 | $200.00 | $2,000.00 |
| | | | |
| **Grand Total** | 3400.3 | | $2,117,751.00 |

# EXHIBIT 1

# SUMMARY OF MEHRI & SKALET, PLLC FEES & EXPENSES

| Category | Amount |
|---|---|
| | |
| Experts | $182,822.37 |
| Depositions & Discovery | $31,913.38 |
| Travel | $17,167.48 |
| Mediator | $9,440.00 |
| Electronic Research | $4,633.14 |
| Printing & Mail | $2,250.83 |
| Court Costs | $1,000.00 |
| Conference Calls | $370.66 |
| Other | $285.58 |
| | |
| **Grand Total** | **$249,883.44** |